## Case No. 10,307.

### NORRIS v. NEWTON et al.

[5 McLean, 92;[1] 7 West. Law J. 515.]

Circuit Court, D. Indiana. May Term, 1850.

SLAVERY—DAMAGES FOR HARBORING FUGITIVES—ARREST OF FUGITIVE—HABEAS CORPUS BY STATE COURT — SUFFICIENCY OF AFFIDAVITS — HELD UNDER AUTHORITY OF THE UNITED STATES.

1. Under the constitution of the United States, the master of fugitives from labor may arrest them wherever they shall be found, if he can do so without a breach of the peace, and take them back to the state from whence they fled.

2. A state judge, on proper affidavit being made, may issue a writ of habeas corpus, and inquire into the cause of detention.

[Quoted in Ex parte Robinson, Case No. 11,-934; Ex parte Sifford. Id. 12,848. Cited in Re Reynolds. Id. 11,722; Robb v. Connolly, 111 U. S. 624, 4 Sup. Ct. 546.]

[Cited in Re Robb, 64 Cal. 433, 1 Pac. 883.]

3. The affidavit of a colored person is sufficient for this purpose.

4. Every person within the jurisdiction of a state owes to it an allegiance. He is amenable to the laws of the state, and the state is bound to protect him in the exercise of his legal rights.

5. When it appears, by the return to the habeas corpus, that the fugitives are in the legal custody of the master, and the facts of the return are not denied, there is an end to the jurisdiction of the state judge. His jurisdiction is special and limited.

[Quoted in Ex parte Robinson, Case No. 11,-934. Cited in Ex parte Sifford, Id. 12,848; Re Farrand, Id. 4,678; Re Reynolds, Id. 11,-722.]

6. When it appears the fugitives are held under the authority of the Union, it is paramount to that of the state

[Quoted in Ex parte Robinson, Case No. 11,-934. Cited in Case of Electoral College, Id. 4.336.]

[Cited in brief in Ex parte Holman, 28 Iowa, 93. Cited in Kneedler v. Lane, 45 Pa. St. 303; McConologue's Case, 107 Mass. 167; Ohio & M. R. Co. v. Fitch, 20 Ind. 506.]

7. And so when an individual is held under the authority of a state, the federal judiciary have no power to release the person so held.

[Cited in Re Reynolds, Case No. 11,722.]

[1] [Reported by Hon. John McLean, Circuit Justice.]

8. If the return to the habeas corpus be denied, the master must prove that his custody of the slaves is legal.

[Cited in Re Robb, 64 Cal. 433, 1 Pac. 883.]

9. If he fail to do this, or make an insufficient return, the state judge may release the fugitives.

10. But the master may subsequently arrest them, and prove them to be his slaves.

11. The master, though he may arrest without any exhibition of claim, or judicial sanction, when required, must show a right to the services of the fugitives.

[This was an action by John Norris against Leander Newton and others to recover damages for harboring fugitive slaves.]

O. H. Smith and Mr. Liston, for plaintiff.
Marshall & Jarnegin, for defendants.

CHARGE OF THE COURT. Gentlemen of the Jury: The plaintiff has brought this action to recover damages for harboring and concealing four colored persons who were his slaves in Kentucky, by reason of which they were enabled to escape, and he has lost their services. It is proved that the plaintiff is a citizen of Boone county, Kentucky, and that he held, as his property, the negroes—Lucy, Lewis, George, and James—named in the declaration. It is also proved by several witnesses, that these negroes absconded from the service of the plaintiff, on Sunday night. the ——— day of October, 1847. Otho Dowdon was at the house of the defendant on that night, saw the negroes there, but, on his rising next morning, at about sunrise, he was informed that they had absconded, and that the plaintiff was in pursuit of them. The witness and several other persons aided the plaintiff in his pursuit of the fugitives for more than one month, but were unable to find them. Certain articles of property, which were known to belong to the negroes, were found near Clarksburg, Indiana; but, not being able to trace them farther, the pursuit was relinquished. About two years after the slaves had absconded, the plaintiff was informed that they resided in Cass county, state of Michigan. He immediately set out, in company with several persons, to recapture them. On the 27th of September last, the company arrived at Casopolis, a village in the above county, about ten or eleven o'clock at night. The house where the negroes were found was entered. A guard was placed at the door to prevent the escape of any one, and the inmates of the house were charged to make no outcry or alarm. The plaintiff, finding his negroes among others in the house, informed them that he had come to take them back to Kentucky. They recognized him, and the younger boys were willing to return. Lewis, the eldest boy, objected, as he had recently been married. The plaintiff informed him that his wife might accompany them, saying that she should be well treated. She, however, declined going with her husband. Lucy, the mother of the

children, interposed no other objection than that her husband would be left behind. David, her husband, had absconded with the others, but was not found when they were recaptured. The four slaves were put into a wagon, Lewis having his arms tied to prevent his escape. The plaintiff's party immediately set out on their return to Kentucky, travelling the remaining part of the night. They took a somewhat circuitous route, passing through the village of South Bend early in the morning of the 28th of September. Between one and two miles south of that village, they stopped to take refreshments. While thus engaged, Crocker, the sheriff of the county, and others, rode up to them, and in a few minutes the company increased to one hundred and forty, or upward, some of them being armed, others had bricks, stones, or clubs. Some of the plaintiff's party observed that force was about to be used to take the negroes from them, and they must resist it. The slaves were directed to get into a wagon, and weapons were drawn. Crocker, one of the defendants, informed the plaintiff that the sheriff had a writ of habeas corpus, and that they had no other object than to ascertain whether the negroes belonged to him. The plaintiff replied that they might ask the negroes whether they were not his slaves. Crocker charged them to answer no questions, but said to the plaintiff that resistance would be useless, as there was force enough to take the negroes back to the village; but, if the plaintiff would agree to return, he should have a fair trial, and it would not detain him more than an hour or two. The plaintiff consented, and returned with the negroes to South Bend. As they approached the court house, a great number of people, black and white, joined them. Time was given to the plaintiff to procure counsel. It appears that the first writ of habeas corpus had been issued for Lucy and Richard, the names of the other two boys not being known. After the return to the village, the first habeas corpus was abandoned, and a second writ, naming the four fugitives, was issued. This was on the forenoon of Friday. To the second writ the plaintiff returned, that "the within named persons were held in his custody as his slaves —that he was a citizen of Boone county, where slavery was authorized by law, and that he had a just claim to the persons named, as his slaves, by the laws of that state—that sometime in the month of October, 1847, the said slaves had absconded and fled from his service in said state, and took refuge in the state of Michigan, where he found them on the 27th instant, and then and there arrested them as fugitives from labor, and took them into his custody, and that he was then on his journey to Boone county, Kentucky, with them as his own slaves and property, they being fugitives from labor."

The counsel who appeared for the negroes moved the judge, who allowed the writ, and before whom it was made returnable, to discharge the negroes, on the ground of the insufficiency of the return; and the case was argued by the counsel on both sides. The court-house was crowded with spectators, and great numbers remained outside of the house, there not being room for them within it. Several of the persons within the house were armed with clubs. The crowd became much excited as the argument was in progress. Under the apprehension that the judge would discharge the fugitives, the plaintiff, by the advice of his counsel, applied for, and obtained, a warrant to arrest the slaves as fugitives from labor, under a statute of Indiana. Hearing that such an application was about being made, Crocker, one of the defendants, who acted as counsel for the negroes, warned the state officer not to issue the warrant, as the supreme court of Indiana had declared the statute to be unconstitutional and void, under the decision of the supreme court of the United States in the case of Prigg v. State of Pennsylvania [16 Pet. (41 U. S.) 539]. But the warrant was issued, and was held by the plaintiff to arrest the fugitives, should the judge discharge them. The judge supposed the procedure was under the act respecting fugitives from labor, of 1793 [1 Stat. 302]; and on the ground that the master had no right to arrest the fugitives to take them out of the state where the arrest was made, but for the purpose only of taking them before some judicial officer of the state, or of the United States, discharged the negroes from the custody of the plaintiff. While the judge was pronouncing his opinion, the plaintiff, holding the writ from the state officer in his hands, arrested the fugitives under it. The opinion being pronounced, Crocker exclaimed in a loud voice, three times, the negroes were discharged—that they were free; and some one said it was the time for action, and called upon those nearest the fugitives to hand them out.

At this time, the plaintiff, touching each of the fugitives, arrested them under the warrant he held, and his party drew their weapons—one or two revolvers and knives— and, standing near the fugitives, warned the crowd not to approach them. The excitement was intense. The plaintiff claimed the protection of the sheriff, and asked him if he would suffer the fugitives, who were his property, to be forcibly taken from him. The sheriff observed that he was doing all he could to pacify the crowd; and it was finally agreed that the negroes should be put into jail, for safe keeping. The plaintiff accompanied them to the jail door, declaring that he would trust no one with the possession of them. Crocker entered the jail shortly after it was entered by the plaintiff with the fugitives and the sheriff. On his coming out of the jail, Crocker pacified the crowd by informing them that the sheriff had as-

sured him the negroes should not be surrendered from his custody without a fair trial. This was a short time after dark, on Friday. On the same evening and the next day, warrants were issued against certain persons of the plaintiff's party, charging them with a riot and other breaches of the peace. One of them was fined by the justice. Civil process was issued against the plaintiff, claiming large damages, in the name of one or more of the negroes, on account of their arrest and imprisonment. Bail was required in the civil and criminal proceedings. On Saturday, the streets of the village of South Bend were crowded with people, the greater part of whom were colored. The latter entered the village in companies, some of them bearing firearms, and almost all of them had clubs. Through the ensuing day the crowd increased. The number of negroes was estimated, by different witnesses, from one hundred and fifty to four hundred. Many of them came from Cass county, in Michigan. The circuit court of the state met at South Bend on Monday, and the complaints for violations of the criminal laws of the state, against the plaintiff and his party, were made before the grand jury. No bills were found, and the persons charged were discharged from their recognizances. On Monday, another writ of habeas corpus was allowed by the judge. directed to the sheriff, commanding him to bring forthwith the negroes in his custody before him, etc. A notice was given to the plaintiff of the issuing of this writ, and of the place where the hearing would be had; but the plaintiff, under the circumstances, declined any further attempt to take the fugitives, and assigned as a reason that his rights had been violated, and that he should claim compensation from those who had injured him. The slaves were discharged by the judge. and, surrounded by a great number of colored persons, they proceeded from the court-house to a wagon, in which they were conveyed off.

Under the act of 1793, the master, or his agent, had a right to seize his absconding slave wherever he might be found—not to take him out of the state, but to bring him before some judicial officer of the state, or of the United States, within the state, to make proof of his right to the services of the fugitive. But, by the decision in the case of Prigg v. State of Pennsylvania, 16 Pet. [41 U. S.] 539, the master has a right to seize his slave in any state where he may be found, if he can do so without a breach of the peace, and, without any exhibition of claim, or authority, take him back to the state from whence he absconded. Believing that this remedy was not necessary to the rights of the master, and, if practically enforced, would produce great excitement in the free states, I dissented from the opinion of the court, and stated my objections with whatever force I was able. But I am as

fully bound by that decision as if I had assented to it. Had the state judge power to issue a writ of habeas corpus in this case? This writ is favored by our laws. It is secured to any person in the fundamental laws of the states and of the Union, as necessary to protect him against acts of oppression. To the people of England it is equally endeared. The people of Indiana, and the people of the other states, have declared that this writ shall not be suspended, except in time of war, or rebellion, and under the greatest emergencies. Every person within the sovereignty of Indiana, without regard to color or condition in life, is bound by its laws and subject to its jurisdiction; and it is immaterial whether his residence be temporary or permanent; he owes for the time being an allegiance to the state. And the principle applies to a mere traveller through the state. He is amenable to the civil and criminal laws of the state; and the state, so long as he shall remain within it, is bound to protect him in his liberty and in the exercise of his legal rights. In a proper case made, the judicial officers of the state cannot withhold from him the benefit of the writ of habeas corpus.

In the present case, affidavits were made that the fugitives in question were free, and that they had been kidnapped by the plaintiff in the state of Michigan, with the view of making them slaves. An affidavit was made to this effect by a white person, a citizen of Michigan, and by one of the colored persons in the custody of the plaintiff. It is objected that a colored person, not being a competent witness in Indiana, could not make such an affidavit. I think differently. For this purpose, at least, he may be sworn. It has been so held in Virginia, and in some of the other slave states. The affidavits being presented to the state judge, which show an unlawful detention and imprisonment, he is bound under the law of the state to issue the writ, if demanded. He knows nothing of the case, and can be presumed to know nothing of it, except what appears upon the face of the affidavits. There can be no higher offense against the laws of humanity and justice, or against the dignity of a state and its laws, than to arrest a free man within its protection, with the view of making him a slave. And this may often be done with impunity, if the remedy by the writ of habeas corpus may not be resorted to. There is no other remedy known to the law, which is so speedy and effectual.

I have no hesitancy in saying that the judicial officers of a state, under its own laws, in a case where an unlawful imprisonment or detention is shown by one or more affidavits, may issue a writ of habeas corpus, and inquire into the cause of detention But this is a special and limited jurisdiction. If the plaintiff, in the recaption of his fugitive slaves, had proceeded under the act of congress, and made proof of his claim before

some judicial officer in Michigan, and procured the certificate which authorized him to take the fugitives to Kentucky, these facts being stated, as the cause of detention, would have terminated this jurisdiction of the judge under the writ. Thus it would appear that the negroes were held under the federal authority, which, in this respect, is paramount to that of the state. The cause of detention being legal, and admitted or proved, no judge could arrest and reverse the remedial proceedings of the master. And the return made by the plaintiff, being clearly within the provisions of the constitution, as decided in the case of Prigg v. State of Pennsylvania [supra], and the facts of that return being admitted by the counsel for the negroes, the judge could exercise no further jurisdiction in the case. His power was at an end. The fugitives were in the legal custody of their master—a custody authorized by the constitution and sanctioned by the supreme court of the Union. If the facts, on the return of the habeas corpus, had been denied, it would have been incumbent on the master to prove them, and that would have terminated the power of the judge. Had the legislature of Indiana provided, by express enactment, that in such a case the judge should discharge the fugitives, the act would have been void. No procedure under it could have been justified or excused. And in the case under consideration, the custody of the master being admitted to be under an authority paramount to that of the state, the discharge of the fugitives by the judge was void, and, consequently, can give no protection to those who acted under it.

No judge of the United States can release any one from a custody under the authority of the state. Some years since, an individual was indicted in the circuit court of the United States for the First circuit, if I mistake not, for a capital offense. The defendant was ascertained to be imprisoned for debt under state process; and the lamented Mr. Justice Story very properly held that he had no power to release him from that custody by a habeas corpus. The authority of the plaintiff to arrest and hold in custody his slaves, under the decision in the Case of Prigg, was as unquestionable as could be that of an officer acting under judicial process. If the master, in his return to the habeas corpus, or in his proof, the return being denied, should fail to show his right to the services of the fugitives, the state judge would have the power to discharge them from his custody. Such a discharge would not be conclusive on the rights of the master. He might again arrest the fugitives, and by additional evidence establish his right to their services. This would be consistent with the dignity of a state, and enable it to give protection to all who are within its jurisdiction, and are entitled to its protection, while, at the same time, it could not impair the rights of the master.

It imposes on him no hardship. When he undertakes to recapture his slaves, under the highest authority known to the country, he must be prepared to show, if legally required to do so, that he is exercising a rightful remedy. This remedy being by the mere act of the party, and without any exhibition of claim or judicial sanction, must be subject to the police power of the state, at least so far as to protect the innocent from outrage. The legal custody of the fugitives by the master being admitted, as stated in the return on the habeas corpus, every step taken subsequently was against law and in violation of his rights. I deem it unnecessary to inquire into the procedure subsequently. It was wholly without authority. The forms of law assumed afford no protection to any one. The slaves were taken from the legal custody of their master, and he thereby lost their services.

It is argued, that the plaintiff abandoned his right to the fugitives by failing to appear to the writ on Monday. Of what value could such an appearance have been to him? His right was admitted in the fullest and broadest terms, as set forth in the return to the second writ. And this being held insufficient by the judge, of what avail could his proof have been? A mistake of the law cannot, in such a case, prejudice the rights of the plaintiff. Crocker acted as counsel. So far as his acts were limited to the duties of counsel, he is not responsible. But, if he exceeded the proper limits of a counsellor at law, he is responsible for his acts the same as any other individual. Every person of the large crowd in the court house, or out of it, who aided, by words or actions, the movement which resulted in the escape of the fugitives, is responsible. On such an occasion, liability is not incurred where no other solicitude is shown by words or actions, than to obtain an impartial trial for the fugitives. But it is earnestly contended that the slaves were entitled to their freedom, from the privilege given to them by the plaintiff to visit Lawrenceburg, in Indiana, on their own business, to sell articles of produce, and at other times were sent there on the business of the plaintiff. It appears that the plaintiff was an indulgent master—that he gave to David, the husband of Lucy, and father of the boys, a piece of ground to cultivate in vegetables for their own use and profit. David was seen by several witnesses at Lawrenceburg at different times, selling vegetables; but there is no express evidence that the plaintiff sent him, or consented that he should cross the river. At one time he was seen at Lawrenceburg, and the plaintiff was also seen in the village at the same time, so that an inference may be drawn that David was there with the consent of his master. At another time David was seen at Lawrenceburg, and the oldest boy, Lewis. A yellow woman was also seen with them, who, the

witness supposes, though he is not certain, may have been Lucy, the wife of David.

Several witnesses state the confessions of the plaintiff, at South Bend, that he had been very indulgent to the fugitives, in permitting them to sell their vegetables on the Indiana side of the river. Some of these confessions are disproved by persons who were present, and who give an entirely different construction to the words of the plaintiff. Instead of saying that he had permitted them to attend the market at Lawrenceburg, he said he had permitted them to attend the market at a village on the Kentucky side, and that he did not know that David might not have crossed the river to find a better market. The conflicting statements of witnesses will be examined and weighed carefully by the jury. Before the interests of the master can be affected by the slave being seen in a free state, it must be clearly shown that he was in such state with the consent of his master. But neither the acts nor the value of the services of David are involved in this case. He has not been arrested by the plaintiff. It is insisted that, if the slaves had been permitted to go to the state of Indiana by the plaintiff, and afterward returned voluntarily to their master, they could not set up the fact as a ground of their release. The courts of the slave states are divided on this question. It is now pending in a case before the supreme court, brought from Kentucky. Under such circumstances, if the jury shall find from the evidence that the fugitives named in the declaration, or any part of them, had, with the consent of the plaintiff, been in Indiana, and had returned to the services of their master, they will so find the fact, and the question will be duly considered on a motion after verdict. There is no pretence to say, when the slaves left the service of the plaintiff, they left with his consent. The facts show clearly that they absconded. The court are asked to instruct you that as the fugitives are still liable to be recaptured by the plaintiff, he cannot recover their value in damages. Whether the plaintiff shall be able to recapture the slaves, if his right to do so be admitted, is subject to many contingencies which cannot well be estimated by a jury. There is certainly no obligation on the plaintiff to use future exertions to reclaim the fugitives; and it would seem to be unjust that those, through whose instrumentality their services have become lost to the plaintiff, if the jury shall so find, should avail themselves of such a defense. In such a case, the act of congress of 1793 gives an action to the plaintiff for the damages received. The damages, in the present case, are estimated by two witnesses, one of whom states them at $2,450, and the other at $2,700, making a difference between the two estimates of $250. The plaintiff's counsel claim interest on the damages estimated from the time the negroes absconded. The court will give no instructions on the question of

interest, but will say to the jury, if they shall find for the plaintiff, they will assess such damages as, on a full consideration of the evidence, they shall believe he has sustained.

I was gratified at the avowal of one of the counsel in the defense, that he disclaimed all influence with the jury, except that which arose from the facts and law of the case. And he particularly repudiated that argument which invoked the conscience of the jury against the established law. This was a manly avowal, and fit to be made in this place and on this occasion. No earthly power has a right to interpose between a man's conscience and his Maker. He has a right an inalienable and absolute right, to worship God according to the dictates of his own conscience. For this he alone must answer, and he is entirely free from all human restraint to think and act for himself. But this is not the case when his acts affect the rights of others. Society has a claim upon all its citizens. General rules have been adopted, in the form of laws, for the protection of the rights of persons and things. These laws lie at the foundation of the social compact, and their observance is essential to the maintenance of civilization. In these matters, the law, and not conscience, constitutes the rule of action. You are sworn to decide this case according to the law and testimony. And you become unfaithful to the solemn injunctions you have taken upon yourselves, when you yield to an influence which you call conscience, that places you above the law and the testimony. Such a rule can apply only to individuals; and, when assumed as a basis of action on the rights of others, it is utterly destructive of all law. What may be deemed a conscientious act by one individual, may be held criminal by another. In the view of one, the act is meritorious; in the view of the other, it should be punished as a crime. And each has the same right, acting under the dictates of his conscience, to carry out his own view. This would overturn the basis of society. We must stand by the law. We have sworn to maintain it. It is expected that the citizens of the free states should be opposed to slavery. But with the abstract principles of slavery we have nothing to do. As a political question there could be no difference of opinion among us on the subject. But our duty is found in the constitution of the Union, as construed by the supreme court. The fugitives from labor we are bound, by the highest obligations, to deliver up on claim of the master being made; and there is no state power which can release the slave from the legal custody of his master.

The chief glory and excellence of our institutions consist in the supremacy of the laws. We are instructed to reverence and obey them from our earliest years. And it is this, connected with a faithful administration of the laws, which has given security to persons and property, throughout the wide extent of our country. In this consists, in a

great degree, the strength of our government. And we should be careful not to weaken its power. There is enough in the general aspect of our affairs, if not to alarm, at least to admonish us that every cord which binds us together should be strengthened. In regard to the arrest of fugitives from labor, the law does not impose active duties on our citizens generally. They are not prohibited from exercising the ordinary charities of life toward the fugitive. To secrete him, or to convey him from the reach of his master, or to rescue him when in legal custody, is forbidden; and for doing this a liability is incurred. This gives to no one a just ground of complaint. He has only to refrain from an express violation of the law, which operates to the injury of his neighbor. Is this a hardship? No law-abiding man can so consider it. He cannot claim a right to do that which the law forbids, without striking at the basis of society. If the law be unwise or impolitic, let it be changed in the mode prescribed; but, so long as it remains the law, every good citizen will conform to it. And every one who arrays himself against it. and endeavors by open or secret means to bring it into contempt, so that it may be violated with impunity, is an enemy to the interests of his country.

Gentlemen, the case is with you. In your deliberations you will carefully weigh the evidence, and, in coming to a determination, you will be guided only by the evidence and the law.

The jury returned a verdict for the plaintiff, for $2,850 in damages.